VICTORY, J.
| ¶ This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana (the “Commission”) that respondent, Judge Leo Boothe of the 7th Judicial District Court, Parishes of Catahoula and Concordia, be removed from office and ordered to reimburse and pay the Commission $11,731.79 in costs incurred in the investigation and prosecution of this case. The Commission conducted an investigatory hearing, made findings of fact and law, and determined that Judge Boothe violated Canons 1, 2A, 2B, 3A(1), 3A(6), and 3C of the Code of Judicial Conduct and engaged in willful conduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brought his judicial office into disrepute, in violation of La. Const. art. V, § 25(C). After reviewing the record and the applicable law, we find that certain charges against Judge Boothe were proven by clear and convincing evidence; however, we reject the recommendation that he be removed from office and find that he be suspended from office for a period of one year, without pay, and ordered to reimburse and pay the Commission $11,731.79 in costs.
FACTS AND PROCEDURAL HISTORY
Judge Boothe assumed his office on January 1, 1991, and has been re-elected without opposition three times thereafter, including most recently in October 2008, 12for a term of office commencing on January 1, 2009.[1] The relevant conduct relates to the case of James Skipper (“Skipper”) and involves circumstances which we admittedly find very hard to understand. In 2002, Skipper was convicted by a Concor-dia Parish jury of three counts of distribution of cocaine and one count of attempted possession of a controlled dangerous substance with intent to distribute. He had been offered a plea bargain that would have allowed him to serve approximately five years in prison, but he claims he rejected that offer based on a conversation with his nephew, Justin Conner, in which Mr. Conner threatened that Skipper’s family would no longer associate with him if he took the plea. Judge Boothe sentenced Skipper to serve a total of eighty years at hard labor — twenty-five years on each count of distribution and five years on the attempted possession charge. In 2003, Judge Boothe amended Skipper’s sentences to make the sentences on all counts run concurrently. The court of appeal subsequently affirmed Skipper’s conviction and the concurrent sentences, and this Court denied writs. State v. Skipper, 03- *1004 0842, 03-0844 (La.App.3 Cir.12/10/03), 861 So.2d 796, writ denied, 04-0003 (La.4/23/04), 870 So.2d 298.
After his twenty-five year sentence became executory in May 2004, Skipper filed numerous pleadings with the 7th JDC in an effort to have the sentence reduced or vacated.[2] These motions, most of which were filed pro se, were routinely denied |3by Judge Boothe. One motion alleged that Judge Boothe had agreed to release him from prison on an appeal bond and would allow him to remain free, on probation, if he helped the Concordia Parish Sheriff garner enough African-American votes to win re-election in 2003. Judge Boothe adamantly denied these allegations and later contended that the alleged “deal” was “cooked up” to hurt him politically by falsely tying him to the sheriff, who, according to Judge Boothe, has “a ton of enemies” and is one of the “most unpopular people in Concordia Parish politically.” The allegations by Skipper against Judge Boothe were frequently reported in the local newspaper and discussed extensively on a now-defunct website known as the Concordia Underground. Judge Boothe admitted that he was very concerned about this negative publicity because “at that time I still had an election ahead of me.”
On June 15, 2008, Skipper wrote to Judge Boothe from prison and wished him a happy Father’s Day. Skipper lamented that because of his incarceration he was unable to see his teenaged son. This letter contained arguments relating to hardship that Skipper had already raised in prior pleadings. Judge Boothe replied to Skipper’s letter on June 29, 2008. In his handwritten response, Judge Boothe acknowledged receiving Skipper’s letter and stated that he wanted to address a few of the things Skipper had written. After telling Skipper that “[f]or some unknown reason you tried to intimidate the court in several ways from the start,” Judge Boothe referred to a “deal” Skipper had come up with that Judge Boothe had never heard of “which was Robviously calculated *1005 to embarrass me and cripple me politically.” Apparently, the “deal” had to do with Gene Allen, the Mayor of Ferriday, and his election efforts. Judge Boothe then addressed the issue of Skipper’s sentence, stating:
As far as you getting any modification of your sentence I always keep an open mind and I certainly would be fair and objective in this matter. As I indicated earlier, nothing would please me more than for you to use your talents in a constructive manner.
At this point no judge can help you unless the District Attorney agreed to waive the state’s right to an objection of untimeliness.
I think you need to understand that the judicial system cannot be bullied, intimidated or manipulated, at least as far as my court is concerned. You will be treated fairly and when and if your conduct merits it you will learn that to be truthful and forthright will get better results than the methods you have employed up to now.
On July 8, 2008, Skipper filed a pro se “Motion to Revisit Defendant [sic] Sentence to Consider Family Heartship [sic] Circumstances which has caused Burden on Defendant [sic] Family,” [hereinafter sometimes referred to as the “reconsideration motion”] asserting that his sentence should be reduced because his incarceration was a hardship for his wife and son. After Skipper filed the motion to reduce his sentence, he wrote back to Judge Boothe and asked that he be granted a hearing and be allowed to appear before Judge Boothe in person, along with the District Attorney, to argue the motion. In the letter, Skipper also accused Gene Allen of misleading him and promising he would be released from prison if he helped his election campaign. (The same “deal” referred to in Judge Boothe’s letter.) Judge Boothe testified that he did not read the entirety of this letter from Skipper. There was nothing in the record before the Hearing Officer or the Commission to indicate that Judge Boothe notified the District Attorney of any of the ex parte correspondence or filed any of it into the record of Skipper’s case.[3]
lsOn August 1, 2008, Judge Boothe signed an order setting the motion for hearing on August 13, 2008. Asked why he set this particular motion for hearing when he had denied many earlier motions by Skipper which raised the same hardship argument, Judge Boothe testified that by 2008, Skipper had already served more time than he would have had he accepted the plea offer made to him prior to his trial. Judge Boothe was also troubled that Skipper’s son, whom he frequently saw at church, was growing up without his father present in the home. However, while *1006 Judge Boothe testified he decided to grant the reconsideration motion out of concern for Skipper’s son, he also admitted he relied on matters beyond the reconsideration motion when he decided to schedule the hearing. Judge Boothe testified he had a “whiff’ of something going on with Judge Kathy Johnson, the other judge in the 7th JDC, but did not know it had anything to do with Skipper’s situation.[4] Judge Boothe did not know precisely what was going on with Judge Johnson, but someone had told him that it would “blow her [Judge Johnson] out of the water” and he “had heard that there were some tapes or something.”
| (¡Immediately before the Reconsideration Hearing, DA John Johnson called Skipper into his office and they met with the door closed.[5] DA Johnson and Judge Johnson had previously been married, and DA Johnson told Skipper that he was very angry at Judge Johnson for something she had said to his mother. DA Johnson threw transcripts of recorded telephone conversations on the desk and told Skipper he had transcripts of Skipper and “Little Bird.” These conversations were recorded from the prison and were between Skipper and Mr. Conner, and one included Judge Johnson.[6] At first, Skipper did not know who DA Johnson was referring to because he did not remember Judge Johnson being called Little Bird. DA Johnson told Skipper in no uncertain terms that if he testified that it was him, Mr. Conner, and Judge Johnson in the recorded telephone conversations, DA Johnson would not oppose his motion for reconsideration. Skipper’s impression was that DA Johnson was not going to recommend that his sentence be reduced unless Skipper admitted it was Judge Johnson in the transcript.
Skipper was optimistic when DA Johnson told him he would not oppose the reconsideration motion. He knew that in most cases, if the DA did not object to a motion, the judge was going to go along with it. Therefore, Skipper was not worried that Judge Boothe had denied all of his previous motions for reconsideration. On the day of the hearing, before he met with DA Johnson, Skipper testified he intended to ^testify about the family hardships upon which he had based his motion to reconsider sentence. However, in his opening statement, he stated:
Your honor, I filed a motion asking the court ... to revisit my sentence based on hardship reasons.
... Because after considering this matter, thinking about some of the stuff I’ve been through, some of the people I lis *1007 tened at, I realized I was nothing but a pawn for some people’s agenda. And as sad as it is to say, one of the people was my family member, one of the people was a dear friend of mine’s, and the other person was a member of the judicial system.
Judge Boothe responded:
What you’re telling me here is mere argument. We’ve been over your hardship thing kind of before ...
... I would like to see some evidence, some testimony or something to back up something or to substantiate. I know something kind of caught my ear, one aspect of this, and I don’t think I saw anything like that in your pleadings. Your pleadings are based on hardship, are you trying to expand your pleadings to include factors that may entitle you to some relief that’s not stated in your petition?
Skipper responded that he was. After Skipper was placed under oath, he testified that he engaged in “conversations with my nephew Justin Conner and Judge Kathy Johnson concerning my case and proceedings held before this Court.” He stated that “the conversations were recently brought to my attention through a recording from the judicial system through the Department of Corrections.” Judge Boothe interposed: ‘You’re talking about documented transcripts of actual telephone conversations?” Skipper explained: “Some conversations dealt with my pursuing the case, how to pursue it, how to proffer motions in return it was in advance to remove people from office. These conversations took place more than once. I’ve seen them. I’m on the transcripts. That’s my testimony.”[7] At that point, DA Johnson began his | squestioning of Skipper. Most of his questions and most of Skipper’s answers dealt with alleged actions or plans in 2006 (the time of the conversations) or thereafter. Skipper confirmed that he had learned the state police and the correctional facilities had recorded his conversations and the recordings had been submitted to the state police and the Attorney General’s Office. Skipper had not received copies of the transcripts of these calls, but had seen them. DA Johnson then questioned Skipper about the plea offer made to him prior to his trial in 2002. Skipper also indicated that prior to his trial he was counseled by Mr. Conner not to take a favorable plea deal of three to five years in prison. According to Skipper, Mr. Conner dissuaded him from accepting the plea offer so that the criminal case could be used as a vehicle to “bring out some things so they could be brought to the attention of the newspaper and so forth,” causing more political harm to Judge Boothe.[8] DA Johnson asked: “Do you feel today that your advice against the plea bargain that was offered to you entered in this conspiracy, entered into this conspiracy by other people including your nephew Justin Conner?” Skipper replied: *1008 “It’s not a question of whether I feel, I know that his advice to me, I would say today wasn’t out of my concern but out of his agenda that he had based on past statements he had made concerning my being in prison.” Skipper testified that Judge Johnson’s actions targeted Judge Boothe because she would become chief judge if Judge Boothe were not re-elected. DA Johnson never asked Skipper if Judge Johnson played any part in his decision to reject the five-year plea offer made to him by the DA’s office in 2002, and Skipper never said that she had. At that point, DA Johnson stated: “Your Honor, at this time, the State has not really agreed to the waiver of the delay for revisitation of his sentence_” He then offered the transcripts of the telephone conversations of July |fl26 and 27, 2006 into evidence. When Skipper stated he had no objection, Judge Boothe asked him if he wanted to make it a joint exhibit. Skipper agreed. The transcripts were introduced into evidence as a joint exhibit. Judge Boothe did not take a recess so that he could read the transcripts; instead he just thumbed through the transcripts.
In reviewing the transcripts, we note that the issues discussed by Mr. Conner and Skipper are somewhat hard to decipher. For example, Mr. Conner and Skipper spoke of how the motion to recuse was filed to “blister” Judge Boothe. During one of the conversations, Mr. Conner telephoned Judge Johnson (whom he referred to as “Little Bird”) to “patch” her into the call. The three-way conversation lasted for several minutes, during which Skipper did most of the talking. The men appear to be asking Judge Johnson certain things about Skipper’s case and how to proceed and Judge Johnson seems to be giving them answers, although the majority of Judge Johnson’s remarks are noted as “inaudible” in the transcript. There is no mention in this transcript of the plea offer Skipper had rejected before his 2002 trial, nor any indication that Judge Johnson knew anything about the plea offer. However, Judge Boothe surmised that given the “context of that conversation,” Judge Johnson was saying something improper to Skipper.
After the transcripts were introduced, Judge Boothe allowed DA Johnson to change the subject matter of the hearing, which went straight to the issue of Judge Johnson’s participation in the three-way telephone conversation with Skipper and Mr. Conner. Judge Boothe then questioned Skipper about a “conspiracy” to make him look bad and ultimately remove him from office:
THE COURT: I’m somewhat, anyway, this is an unusual situation. But it was alluded to that there was a conspiracy to remove this judge from this case and from this, and as judge?
SKIPPER: Yes, sir.
| ]0THE COURT: Did that have anything to do with the adverse publicity that this Court received concerning alleged deals and that sort of thing that was printed in the local newspaper?
SKIPPER: Your Honor, as I explained that to the district attorney, and that will not change, I was advised by Gene Allen that I wouldn’t return to prison and I believe[d] him. But as far as everything that was filed with the judiciary committee, I was told how to file it, basically who to contact, who to write and so forth.
THE COURT: Skipper, you mentioned an agenda. You mentioned your nephew Justin Conner, did you feel that Justin Conner and other parties had an objective or an agenda that conflicted with your case being handled in a certain way in this judicial district? In other words, that agenda superseded concerns about your [fate] or concerns *1009 about how you would be treated by this district?
SKIPPER: Yes, sir.
THE COURT: And you felt that you were exploited or used for their agenda; is that what you’re telling this Court?
SKIPPER: Without question I was. I know I was.
THE COURT: And the objective during some of these hearings that we had and all the publicity was an agenda to remove this judge from this position?
SKIPPER: Basically to bring out some things so they could be brought to the attention of the newspaper and so forth.
THE COURT: All right. Were you aware, Mr. Skipper, that any situation you presented involving members of the community at large and that sort of thing is one thing, but if a member of the judiciary or this judicial system exploited or used you or you were kind of scapegoated in that way, that would be a totally different point of view and a totally different — in other words, this Court would be greatly aggrieved if a defendant in this judicial system was treated detrimentally or exploited for purposes other than the ends of justice. And as a member of this judicial system, I want everybody that appears in this judicial system to get justice.
And if someone involved, highly placed in this judicial system, had other agenda or did something detrimental to a defendant such as yourself, then that would be the fault of the system and not your fault. That would be something — what I’m telling you is if this is your position, then this Court would have to consider giving you some relief because to some extent you were victimized by the system. Is that correct?
SKIPPER: Yes, sir.
luTHE COURT: And you’re telling me that these documented phone calls, that and I haven’t — they’ve been introduced into evidence, you’re telling me that you were having a direct conversation with a judge in this division, a direct personal phone contact where you could talk to that person and interchange ideas and communicate?
SKIPPER: Yes, sir.
THE COURT: And this was arranged by your nephew Justin Conner?
SKIPPER: Yes, sir.
THE COURT: No more questions....
While Skipper did not present evidence of the hardship upon which he had based the motion to reconsider sentence, he did state that “I’d like to call my wife to the stand to expand on the motion I filed concerning the reason for the hardship request.” Judge Boothe stated:
I’m pretty familiar with your hardship situation. And it’s a very compelling one. But it doesn’t rise to the level necessary of getting relief. It’s a factor, but this other issue that you have raised, the one that you have brought to this Court’s attention for the first time here today is monumental. In that aspect of your motion, that is something that is the fault of the system and not you. And that might entitle you to some relief that this Court has not entertained before. But if you want to flesh out the record with your hardship situation, I would ... entertain your witness.
At his point, Skipper stated that he “would just ask that the Court take the motion as it is.”
In his closing statement at the Hardship Hearing, DA Johnson waived the State’s objection to the untimeliness of Skipper’s motion and recommended that Skipper’s sentence be reduced to twelve years, explaining:
[WJhen I offered a plea bargain agreement to Mr. Skipper ... the day that he entered trial, for five years, I thought *1010 that was more than reasonable to Mr. Skipper at the time ... I could not understand why he would turn down such an attractive offer ... But now with the advice and the testimony and the transcripts of these tapes, I can understand that perhaps he was used as a pawn in the general scheme of things and I have no problem to waive delays. ... I’m not justifying what Mr. Skipper had done as far as the criminal offenses whatsoever ... However, I do feel that he was being used as a 112pawn and then I would recommend to the Court that his sentence be reduced from the present sentence of ... 25 years to 12 years in the penitentiary.
At the conclusion of the hearing, Judge Boothe granted Skipper’s motion and reduced his sentence to twelve years, as recommended by DA Johnson. This ruling made Skipper immediately eligible to be released from prison. Considering the testimony, Judge Boothe concluded that the reduction was justified because Skipper’s criminal case had been corrupted by Judge Johnson and others who “duped” Skipper into rejecting a favorable plea deal for their own personal benefit. In oral reasons for judgment, Judge Boothe stated:
... These are remarkable developments. This Court is saddened to hear this type evidence. I do know that during the handling of the Skipper matter, I was mystified as to Mr. Skipper’s actions. Because this Court was accused of doing ... these deals or whatever [that] were not only untrue, that they had never been discussed. As I stated, this Court is saddened to hear the allegations and apparently they’re more than mere allegations because there’s documented transcripts of actual phone conversations. This Court was mystified as to why Mr. Skipper’s constant approach to his problem was to attack the system and attack this Court. It is now his position that he was advised and encouraged to do this by other people who had their own agenda to achieve certain results and consequences in this judicial district. He has alleged, under oath, that one of those parties occupied one of the highest seats in this judicial district.
The judicial system is responsible for its own. We are all obligated to see that justice is administered. I had a very negative view toward Mr. Skipper’s approach. But he’s entitled to justice just like anybody else. And if this system let him down in this regard and there seems to be documentation to that effect, if this system was used to exploit him and to create a result in the judicial system that was not fair to him because of other people’s agendas and ambitions and things that he was imposed on him and suggested to him.
With that in mind, what’s been disclosed here and the evidence adduced and Mr. Skipper’s testimony and the argument, this Court has a different view of its responsibility to Mr. Skipper. As I indicated earlier, [the alleged hardships of Mr. Skipper’s family members] are all factors which I had considered before and they were very compelling but I didn’t feel that Mr. Skipper was, with the attitude that he had displayed about how the system was handling him, showed that he was sufficiently rehabilitated to get relief.
| isWith this new perspective and with this startling information and these saddening developments that have come before this Court, to make a long story short, that completely changes the whole equation. ... I apologize to you on behalf of the justice system for this type of activity and that you were adversely affected by actions and motivations of this type. That as a citizen of this judicial district, as a citizen of Concordia *1011 Parish, that you weren’t given a blank sheet and a fair justice in a way that I, as my utmost goal, that everybody gets. And now I understand and now it makes sense to me based on what you’re telling me how mystified I was for so long about how this was coming down that this was not all at your doorstep.
With the complicity of the involvement of other people and some of them directly connected with the judicial system and that’s the part that entitles you to relief. Is that if the judicial, a part of the judicial system lets you down. If this is accepted and there’s documented phone conversations and that sort of thing. And all of these factors together is compelling me to modify your sentence in the manner recommended by the State. I hereby modify your sentence in the following manner: You are to serve 12 years with the Louisiana Department of Public Safety and Corrections. And you’ll be given credit for time served.
Approximately one month after the hearing, and feeling that his decision to grant relief to Skipper “needed fleshing out,” Judge Boothe issued eight pages of written reasons for judgment, specifically mentioning Judge Johnson by name and concluding that she and others “corrupted” Skipper’s criminal case “for a personal agenda.” On August 21, 2008, THE CON-CORDIA SENTINEL newspaper published three articles about the Skipper case, entitled “Drug dealer testimony, jail tapes may result in probe of judge” (referring to Judge Johnson), “Judge Johnson statement; plans to sue District Attorney for defamation,” and “Judge Boothe’s ruling in James Skipper case.” On September 11, 2008, the Alexandria newspaper, THE TOWN TALK, published an article about the Skipper case entitled “Judge issues written reasons for cutting drug sentence.” According to Judge Johnson, the proceedings involving Skipper were politically timed and aimed at defeating her in her bid for re-election in the fall of 2008. Judge Johnson had an opponent in that election; Judge Boothe was unopposed.
| i4The Office of Special Counsel sent inquiry letters to Judge Boothe following the publication of these articles; Judge Boothe responded by denying any wrongdoing and citing his belief that “the unusual circumstances involving Mr. Skipper’s situation wherein he was unduly influenced to reject a plea bargain against his best interest by a party who was an integral part of the judicial system entitled him to out of time relief.”
On February 28, 2011, the Commission filed Formal Charge 0305 against Judge Boothe. In Count I, the Commission alleged that Judge Boothe violated the Code of Judicial Conduct and the Louisiana Constitution by the following conduct:
1. On August 7, 2008, you set a hearing for August 13, 2008, to hear testimony concerning the pro se Motion to Reconsider Sentence filed by James Skipper the criminal defendant in State v. James Skipper, Case No. 01-2396. This motion sought to reduce Mr. Skipper’s sentence of 25 years at hard labor, which he began serving on June 12, 2002, and which was made executory on May 12, 2004. (You had previously sentenced Mr. Skipper on June 2, 2002, to consecutive sentences totaling 80 years, but on February 12, 2003, amended the sentences so that all separate counts run concurrent.)
2. On August 7, 2008, and at all times thereafter, you had no legal authority to reconsider or reduce Mr. Skipper’s sentence because the time period for filing a motion to reconsider or reduce Mr. Skipper’s sentence expired on February 12, 2006.
*1012 3. You had previously denied each of Mr. Skipper’s earlier motions to reduce or vacate his sentence as untimely.
4. The only specific ground stated in Mr. Skipper’s most recent untimely Motion to Reconsider Sentence was “family hardship.” None of the evidence that you allowed to be introduced at the hearing on August 13, 2008, the joint exhibits that you allowed to be introduced at the hearing on August 13, 2008, the joint exhibits of transcripts dating from 2006 and Mr. Skipper’s testimony about those transcripts, was material and relevant to the stated basis for Mr. Skipper’s motion.
5. At the conclusion of the hearing you reduced Mr. Skipper’s sentence to 12 years at hard labor.
6. You gave no legal basis for your reconsideration and reduction of Mr. Skipper’s sentence. In your Reasons for Judgment filed September 9, 2008, however, you stated that “if a judge [Judge Johnson] corrupts a criminal proceeding for a personal agenda, the defendant, even if guilty, benefits by the misconduct of the judge.”
[1S7. The alleged involvement of Judge Johnson occurred long after Mr. Skipper’s sentence became executory and her alleged after-the-fact involvement did not provide a legal basis for the reconsideration and reduction of Mr. Skipper’s sentence.
8. Your decision to reconsider and reduce Mr. Skipper’s sentence was not based on the grounds that were stated in his motion and you did not have a legal basis upon which to consider the motion.
9. Your judicial actions and ruling, as set forth herein, constitute a failure to follow clear and determined law about which there is no confusion or question.
10. Your judicial actions and ruling, as set forth herein, were motivated by the advancement of your personal interests and were influenced by your personal and political relationships. Your judicial actions and ruling were intentional, egregious and committed in bad faith.
The Commission alleged that this conduct by Judge Boothe violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2B (a judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment), and 3A(1) (a judge shall be faithful to the law and maintain professional competence in it, and shall be unswayed by partisan interests, public clamor, or fear of criticism). The Commission further alleged that Judge Boothe engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const, art. V, § 25(C).
In Count II, the Commission alleged the following conduct constituted judicial misconduct:
1. On August 7, 2008, you set a hearing for August 13, 2008, to take testimony concerning the pro se Motion to Reconsider Sentence filed by James Skipper, the criminal defendant in State v. James Skipper, Case No. 01-2396.
2. At the August 13, 2008 hearing on Mr. Skipper’s Motion to Reconsider Sentence, Mr. Skipper testified that he was instructed, as Impart of an alleged conspiracy against you, to file a complaint of judicial misconduct against you. You were aware of the subject matter of Mr. Skipper’s testimony prior to the hearing or, alternatively, shortly after the hearing began.
*1013 3. You, by your statements in the hearing and the leading questions you asked Mr. Skipper about the alleged conspiracy, appeared to have knowledge gained prior to the hearing, not from the pleadings or the case records but from a private or an ex parte communication. This communication and the knowledge obtained was designed to influence your judicial action in the Skipper case.
4. “In a criminal case a judge of any court, trial or appellate, shall be recused when he: (1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial.... (6) Would be unable, for any other reason, to conduct a fair and impartial trial.” La.C.Cr.P. art. 671 A.
5. Despite the fact that you become aware prior to, or shortly after the August 13, 2008 hearing began, that Mr. Skipper’s testimony at the hearing would allege a conspiracy to damage your reputation, you did not recuse yourself. Instead, you presided at the hearing, ruled on Mr. Skipper’s Motion to Reconsider Sentence and ultimately reduced his sentence.
6. When you became aware of the subject matter of Mr. Skipper’s testimony, you were no longer personally disinterested or an unbiased fact-finder as to the veracity of Mr. Skipper’s testimony and the outcome of the proceedings.
7. In your Reasons for Judgment filed September 9, 2008, you made the following comment about the transcripts introduced as evidence in support of Mr. Skipper’s motion: “This again corroborates Skipper’s testimony that he was part of a conspiracy to cripple and embarrass this judge ...” This language confirms that you were no longer an objective fact-finder and that your impartiality in the case would be highly suspect.
8. Your recusal from Mr. Skipper’s case was mandated by La. C.Cr.P. Art. 671, because you were biased, prejudiced and personally interested in having Mr. Skipper publicly testify about his alleged conspiracy. You could not render a fair and impartial decision on his motion. Your recusal from Mr. Skipper’s case was also mandated under Canon 3 because your impartiality might reasonably be questioned.
9. By failing to self recuse from the Skipper case, it is apparent that you willfully decided not to comply with La. C.Cr.P. Art. 3 and Canon 3.
10. Your willful failure to respect and comply with the law requiring your self recusal was motivated and/or influenced by your personal and/or political interests in providing Mr. Skipper a forum and | ^opportunity to testify about the alleged conspiracy against you and in giving credence to those allegations. By doing so, you lent the prestige of your office to advance your personal interests and you allowed political or other relationships to influence your judicial conduct and judgment.
The Commission alleged that this conduct by Judge Boothe violated Canons 1, 2A, 2B, 3A(1), 3A(6) (a judge shall not permit private or ex parte interviews, arguments or communications designed to influence her judicial action in any case), and 3C (a judge should disqualify herself in a proceeding in which the judge’s impartiality might be reasonably be questioned) of the Code of Judicial Conduct. The Commission further alleged this conduct violated La. Const. art. V, § 25(C).
Count III alleged improprieties in connection with Skipper’s appeal bond in 2003, but the Commission ultimately determined that Count III was not proven by clear and convincing evidence. The Commission *1014 redacted all evidence relating to that count from the record.[9]
On May 25, 2011, the Commission amended and supplemented the Formal Charge to add Count IV. In this count, the Commission alleged judicial misconduct by the following acts:
1. On June 15, 2008, James Skipper, the criminal defendant in State v. James Skipper, Case No. 01-2396, wrote a four-page letter to you from prison.
2. On June 29, 2008, you answered Mr. Skipper in a two-page letter that alluded to a “modification of [Mr. Skipper’s] sentence” in this letter. You advised Mr. Skipper that “At this point no judge can help you unless the District Attorney agreed to waive the state’s right to an objections of untimeliness.”
3. On July 7, 2008, Mr. Skipper filed a Motion to Revisit Defendant [sic] Sentence to Consider Family Hardship Circumstances |¾ ¿which has caused a Burden on Defendant [sic] Family.
4. On August 4, 2008, in response to your June 29, 2008 letter, Mr. Skipper wrote you an eight-page letter. He asks you to “grant [him] a hearing and allow [him] to in person [sic] ask John [District Attorney John F. Johnson] [himself] to allow you to revisit [his] sentence and your ruling ...”
5. On August 7, 2008, you set a hearing for August 13, 2008, to take testimony concerning the pro se Motion filed by Mr. Skipper in State v. James Skipper, Case No. 01-2396.
6. On August 7, 2008, you signed an Order filed by District Attorney John F. Johnson as part of the State’s Motion to Return Inmate from a State Institution for a Hearing.
7. In your June 29, 2008 letter, you also said that you “agreed to meet with a large number of ministers and find [sic] that they were trying to lobby on [Mr. Skipper’s] behalf.”
8. Your actions, as forth herein, constitute ex paHe communications designed to influence your judicial action in a case in which you presided on August 13, 2008.
9. You knowingly accepted oral and/or written communications designed to influence you judicial action in the Skipper case in which the contents were not promptly made known to all parties.
10. Despite the fact that you had these ex paHe communications prior to the August 13, 2008 hearing, you did not recuse yourself. Instead, you presided at the hearing, ruled on Mr. Skipper’s Motion to Reconsider Sentence and ultimately reduced his sentence.
11. Your recusal from Mr. Skipper’s case was mandated by La.C.Cr.P. art. 671, because you were biased, prejudiced and personally interested in Mr. Skipper’s case as shown in your June 29, 2008 letter. You could not render a fair and impartial decision on his motion. Your recusal from Mr. Skipper’s case was also mandated under Canon 3C of the Code of Judicial Conduct because your impartiality might reasonably be questioned.
12. By failing to self recuse from the Skipper case after these ex paHe com *1015 munications, you willfully decided not to comply with La.C.Cr.P. art. 671 and Canon 3C of the Code of Judicial Conduct.
The Commission alleged that this conduct by Judge Boothe violated Canons 1, 2A, 2B, 3A(6), 3A(10) (a judge shall not, with respect to cases, controversies or issues that are likely to come before the court, make pledges, promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of the 11;,office), and 3C of the Code of Judicial Conduct. The Commission further alleged this conduct violated La. Const. art. V, § 25(C).
Judge Boothe answered the Formal Charge, as amended, and denied any misconduct. Thereafter, a hearing officer was appointed to conduct proceedings pursuant to Supreme Court Rule XXIII, § 29. Hearing Officer Ulysses Gene Thibodeaux convened a hearing on August 3-5, 2011. On February 2, 2012, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. The Hearing Officer found that only Count I of the Formal Charge had been proven by clear and convincing evidence. With regard to that Count, the Hearing Officer specifically found that Judge Boothe violated Canons 1, 2, and 3A(1) but that “the only egregious error and the only ‘pattern or practice of legal error committed by Judge Boothe was holding the Hardship Hearing [the hearing on the motion to reconsider sentence] over which Judge Boothe clearly had no subject matter jurisdiction and holding other hearings for modifications of sentence when he had no subject matter jurisdiction to do so.” But also with regard to Count I, the Hearing Officer found the facts were insufficient to support a finding that Judge Boothe violated Canon 2B, which prohibits a judge from allowing his judgment to be influenced by political relationships. The Hearing Officer found that any other legal errors regarding the Hardship Hearing did not rise to the level of judicial misconduct. Regarding Count II, the Hearing Officer found Judge Boothe’s failure to recuse himself did not rise to the level of judicial misconduct because the degree of animosity between Judge Boothe and Judge Johnson did not rise to such a level that Judge Boothe could not be unbiased regarding the parties actually involved in the Hardship Hearing. Regarding Count IV, the Hearing Officer concluded that the ex parte communications were not intended to give a procedural or tactical advantage to Skipper and that he received no procedural or tactical advantage.
12nFollowing the filing of the Hearing Officer’s report, the Commission established a briefing schedule and ordered Judge Boothe to appear on May 18, 2012 to answer questions from the Commission and to make any statement he desired regarding the Formal Charge and the Hearing Officer’s findings and conclusions. The Commission also subpoenaed three witnesses who had appeared before the Hearing Officer to appear before the members for questioning, namely Judge Johnson, Skipper, and Mr. Conner.[10]
On August 7, 2012, the Commission filed its recommendation in this Court, finding that Counts I, II, and IV of the Formal Charge were proven by clear and convincing evidence. As to Count I, in addition to finding, as the Hearing Officer did, that Judge Boothe committed judicial misconduct by holding the hearing on the motion to reconsider sentence without jurisdiction *1016 to do so, the Commission found that he violated Canon 2B by allowing family, social, political, or other relationships to influence his judicial conduct and judgment and by lending the prestige of his judicial office to advance the private interest of himself and others. The Commission found that Judge Boothe held the hearing and commented at length concerning the transcripts of Skipper’s telephone conversations as a means of tarnishing Judge Johnson’s reputation and rehabilitating his own. Further, the Commission found that the public embarrassment to the judiciary caused by the negative publicity was exacerbated by the written reasons for judgment subsequently penned by Judge Boothe, which was the subject of a newspaper article in the Town Talk on September 11, 2008. His conduct in conducting the hearing was an egregious legal error made in bad faith and constituted willful conduct relating to his official duty, in violation of Article V, Section 25(C) of the Louisiana Constitution.
1⅞1 Regarding Count II, the Commission found the factual circumstances surrounding Skipper’s Reconsideration Motion and Hearing were such that no reasonable judge in Judge Boothe’s position would have heard the case. These factual circumstances included the following. First, Judge Boothe admitted he was being “blasted” in the newspaper about some alleged deal involving Skipper; that Skipper had cooked up a recusal motion that was “a nightmare;” that Skipper was filing an avalanche of papers and the Underground was blasting him; that Skipper really knew where to hit him so that it hurt; and he believed Skipper had come up with allegations about a deal that was obviously calculated to embarrass and cripple him politically. Second, Judge Boothe admitted there was friction between himself and the other judge in that district, Judge Johnson, who was telling people that if she had an opponent in her division, she was going to run against him in his. Third, Judge Boothe was very close to DA Johnson, his third cousin, and the two men knew each other “like a book;” DA Johnson was very angry with Judge Johnson; and DA Johnson showed at least one person the transcripts of the telephone calls and said Judge Johnson was “going down.” Fourth, there was no evidence that in 2002 Judge Johnson played any part in Skipper’s decision to reject a five-year plea deal offered to him by DA Johnson, yet Judge Boothe granted Skipper’s motion to reconsider sentence on grounds that Skipper had been victimized by Judge Johnson. Fifth, DA Johnson questioned Skipper about an alleged conspiracy against Judge Boothe aimed at injuring Judge Boothe’s reputation and removing him from his position as the Chief Judge in the 7th JDC. Based on these facts, the Commission found that Judge Boothe was biased, prejudiced, and personally interested in the cause to such an extent that he was unable to conduct a fair and impartial trial and that an impartial judge faced with an such an untimely motion stating only family hardship as the grounds for reconsideration would have denied the motion as untimely. The | ggCommission found his failure to recuse violated Canons 1, 2A, 3A(1), and 3C and Article V, Section 25(C) of the Louisiana Constitution.
Regarding Count IV, the Commission found that Judge Boothe engaged in impermissible ex parte communications with Skipper by accepting his June 15 and August 4, 2008, letters and failing to file the letters into the record with the clerk of court or to provide copies to the DA’s office. The letters were designed to influence his judicial action in Skipper’s case and whether the letters accomplished this purpose is immaterial to whether Judge Boothe’s conduct constituted an impermissible ex parte communication. Judge *1017 Boothe further engaged in ex parte communication by writing back to Skipper, again without filing it in the record or furnishing it the DA’s office, and, the letter was not written for scheduling or administrative purposes or to address an emergency not dealing with substantive issues on the merits. This conduct violated Canon 1, Canon 2A, Canon 3A(6) (by engaging in a series of impermissible ex parte communications with Skipper), and Article V, Section 25(C) of the Louisiana Constitution (because Judge Boothe clearly knew the proper course of action in dealing with unsolicited correspondence from a party was to file a copy of the communication into the record and provide a copy to the other side, as evidenced by his actions with regard to an earlier letter from Skipper).
Based on the above conduct, the Commission recommended that Judge Boothe be removed from office and ordered to pay $11,731.79 in costs. In recommending removal, the Commission found that “Judge Boothe flagrantly exploited the power of his office by scheduling and conducting a hearing on an untimely motion for reconsideration of sentence and granting relief when his court had no jurisdiction, all to satisfy his own personal desire for public vindication for himself, to subject Judge Kathy Johnson to public ridicule and embarrassment, and to aid and abet DA Johnson in his desire to exact revenge on Judge Johnson.” The Commission also based this Indecision on Judge Boothe’s substantial judicial experience, prior misconduct, and lack of remorse.
The matter was then set on the docket for oral argument pursuant to Supreme Court Rule XXIII, § 14.[11]
DISCUSSION
This Court has original jurisdiction in judicial disciplinary proceedings. La. Const. Art. V, Sec. 25(C). Therefore, this *1018 Court has the power to make original determinations of fact based upon the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Commission. The grounds for disciplinary action against a judge are set forth in La. Const. Art. V, Sec. 25(C), which provides:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the | ^judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during the pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
Under its supervisory authority over all lower courts, this Court adopted the Code of Judicial Conduct, effective January 1, 1976. The Code of Judicial Conduct is binding on all judges, and violations of the Canons contained therein may serve as the basis for the disciplinary action provided by La. Const. Art. V, Sec. 25(C). In re Quirk, 97-1143 (La.12/12/97), 705 So.2d 172, 176; In re Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019, 1021; In re Decuir, 95-0056 (La.5/22/95), 654 So.2d 687, 692. The standard of proof in judicial discipline cases is the clear and convincing standard. Quirk, supra; In re Johnson, 96-1866 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the Commission’s factual findings must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. Id.

Count I

Essentially, Count I alleges that Judge Boothe set the hearing to reconsider Skipper’s sentence and reduced his sentence all without jurisdiction or the legal authority to do so. Further, Judge Boothe’s reasons for reducing the sentence were based on allegations against Judge Johnson, which did not provide a legal basis to reduce the sentence. This was allegedly done in bad faith for his own personal gain.
La.C.Cr.P. art. 881.1(A)(1) provides that “[i]n felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court [ ^may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.” La.C.Cr.P. art. 881.1(C) provides that “[i]f a motion is made or filed under Paragraph A of this Article, the trial court may resentence the defendant despite the pendency of an appeal or the commencement of execution of the sentence.” When Skipper was initially sentenced on June 12, 2002, the record reflects that “the Court advised the accused that he has TWO (2) years to file for POST CONVICTION RELIEF from the date this conviction becomes final.” After Skipper filed a Motion to Reconsider Sentence, on February 12, 2003, Judge Boothe amended the sentence to have the original sentence on all counts and charges to run concurrently, rather than consecutively. *1019 The record reflects that Judge Boothe “granted the accused THIRTY-SIX (36) months to file a future motion to reconsider.” Thus, under La.C.Cr.P. art. 881.1(A)(1), Skipper had until February 12, 2006 to file a motion to reconsider sentence, and the motion to reconsider sentence at issue was not filed until July 8, 2008.
Judge Boothe claims, and there was testimony at the hearing, that untimely motions to reconsider are frequently considered in the 7th Judicial District where the State does not object to the untimeliness. Judge Boothe testified he had done this four to seven times before. Judge Boothe considered this a procedural matter which may be properly waived. Judge Boothe points out that while La.C.Cr.P. art. 916[12] divests the trial court of jurisdiction upon the entering of the order of appeal, that 12fiarticle allows the trial judge to take certain actions after that time, including “correcting] an illegal sentence or tak[ing] other appropriate action pursuant to a properly made or filed motion to reconsider sentence.” La.C.Cr.P. art. 916(3). In his view, the motion to reconsider sentence was properly made because the untimeliness was waived by the state. The Hearing Officer and the Commission found that Judge Boothe had no jurisdiction to consider the untimely motion to reconsider sentence because a trial court has no jurisdiction to entertain applications for post-conviction relief or motions to reconsider sentence if they are not timely filed. As a jurisdictional matter, the Commission found this could not be waived. By holding this hearing, the Commission found that this was a legal error which was egregious and made in bad faith, and that Judge Boothe engaged in a pattern of ignoring clear and determined jurisdictional mandates in connection with the reduction of the sentences of criminal defendants. Therefore, the Commission found that Judge Boothe committed judicial misconduct under Quirk, supra.
In Quirk we were presented for the first time with the issue of the circumstances under which a legal error by a judge could constitute grounds for a finding of judicial misconduct. We held that “[i]n order to maintain an independent judiciary, mere errors of law or simple abuses of judicial discretion should not amount to judicial misconduct.” 705 So.2d at 178. After reviewing cases from other jurisdictions, we determined that a judge may be found to have violated La. Const. Art. V, Sec. 25 “by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error.” Id. at 181.
We have found no eases which challenged a trial judge for entertaining an untimely motion to reconsider sentence where the opposing party did not object to the 127untimeliness of the motion. While this fact is by no means dispositive of whether a law is clear, determined, and not subject to confusion or question, it is a fact to be considered in making that determination. However, La.C.Cr.P. art. 916(3) only allows a trial court to consider a motion to reconsider sentence if “properly made or filed.” The article does not de- *1020 fíne what constitutes a “properly made or filed” motion to reconsider sentence, but an untimely motion cannot be said to be “properly made or filed.” We note that under La.C.Cr.P. art. 881.6,[13] enacted in 2011, there are no time limits for a DA to file a motion to reconsider sentence based on “substantial assistance” by the defendant Thus, a DA can now file the same motion, and the trial court would have jurisdiction over that motion. In any event, considering an untimely motion to reconsider sentence filed by a defendant is not permissible under La.C.Cr.P. art. 916(3). However, as there is no precedent establishing that a trial court lacks jurisdiction to hear such a motion, and where the parties agree in requesting relief, we find that this legal error by Judge Boothe does not meet the requirements of Quirk because it was not made “contrary to clear and determined law about which there is no confusion or question as to its interpretation ...” Having found this, we need not speculate over whether Judge Boothe set this hearing as an opportunity to bring out evidence unfavorable to Judge Johnson and exculpatory to him, although this is the only explanation that makes any sense.[14] Therefore, finding that Judge | ^Boothe’s conduct in conducting this hearing was not contrary to clear and determined law about which there is no confusion as to its interpretation, we find Count I has not been proven by clear and convincing evidence.

Count II

The Commission found that Judge Boothe should have recused himself from Skipper’s reconsideration of sentence motion because he was biased, prejudiced, and personally interested in the cause to such an extent that he was unable to conduct a fair and impartial trial. Judge Boothe argues that the Commission failed to meet the clear and convincing evidentia-ry standard required to prove these allegations in a case of judicial discipline because none of the statutory grounds for recusal were applicable.
Canon 3C provides:
A judge should disqualify himself or herself in a proceeding in which the judge’s impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.
La.C.Cr.P. art. 671 provides the grounds for mandatory recusal of judges in criminal cases:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent *1021 that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or' consulted as an attorney in the cause, or has been associated with an attorney during the latter’s employment in the cause;
(4) Is a witness in the cause;
129(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
In In re Cooks, we held that “where the circumstantial evidence of bias or prejudice is so overwhelming that no reasonable judge would hear the case, failure of a judge to recuse herself is a violation of the Code of Judicial Conduct as well as the Louisiana Constitution.” 96-1477 (La.5/20/97), 694 So.2d 892, 903.
The Commission found that recusal was required under La.C.Cr.P. art. 671(A)(1) because Judge Boothe had an interest in having the allegations against Judge Johnson publicized and given some credibility, due to the previous attacks upon him by Skipper’s allegations in previous recusal motions, because of his close relationship with DA Johnson, and because of his poor relationship and friction with Judge Johnson. Essentially, the Commission found that he used this opportunity to make public the allegations against Judge Johnson and discredit the allegations Skipper had previously made against him, all for his own personal interest and gain. The Commission ultimately determined that Judge Boothe’s conduct in not recusing himself once it became clear that the allegations Skipper was making at the reconsideration hearing impacted him personally violated Canons 1, 2A, 3A(1) and 3C of the Code of Judicial Conduct and Art. V, Sec. 25(C) of the Louisiana Constitution.
Judge Boothe argues that La.C.Cr.P. art. 671(A)(2)-(5) are not applicable, and also argues that La.C.Cr.P. art. 671(A)(1) and (6) did not require his recusal because there was no possibility of bias, partiality, or unfairness in this reconsideration hearing because both sides were asking for the same thing, a reduction of the sentence to 12 years. He argues that recusal is only required when there is bias toward or against a party to the proceeding, and here the only bias alleged is a bias against | g0Judge Johnson.[15] He testified he did not *1022 think he needed to recuse himself after the tapes were introduced because they would be part of the public record anyway. Further, he did not think Skipper could get justice from a judge who did not know the facts and the personalities involved as well as he did.[16]
We disagree with Judge Boothe. La. C.Cr.P. art. 671(A)(1) requires recusal not only when the judge is biased or prejudiced for or against a party, but also when the | ai judge is “personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial.” As found by the Commission, Judge Boothe committed judicial misconduct by failing to recuse himself once it became clear Skipper was going to make allegations against Judge Johnson that would work toward his benefit. Further, after he decided the case from the bench, he wrote detailed written reasons which corroborated the credibility of Skipper’s allegations of a conspiracy involving Judge Johnson to damage his reputation and which exonerated him from the attacks Skipper had made against him in the various motions which were reported in the press.[17] This was all willfully done for his personal gain. As such, we find that Judge Boothe’s conduct violated Canons 1, 2A, 2B, 3A(1), 3C, and La. Const. art. V, § 25(C).

Count IV

The Commission found Judge Boothe engaged in impermissible ex parte communications with Skipper and failed to provide them to the DA’s office. Canon 3A(6) provides that a judge “shall not permit private or ex parte interviews, arguments or communications designed to influence his or her judicial action in any case, either civil or criminal,” except “as permitted by law.” The Canon further provides: “A judge shall not knowingly accept in any case briefs, documents or *1023 written communications intended or calculated to influence his or her action unless the contents are promptly made known to all parties.” However, “[w]here circumstances require, ex parte communications are authorized for scheduling, | ^administrative purposes or emergencies that do not deal with substantive matters or issues on the merits.” Canon 3A(6).
Judge Boothe attempted to justify his correspondence to Skipper by stating that he considered Skipper to be acting as his own attorney in the case, because he was a pro se litigant. Judge Boothe also contended that it is permissible for judges to write to attorneys ex parte about “scheduling orders and things like that,” and testified to the Hearing Officer that his letter to Skipper was about “scheduling stuff.” Nevertheless, Judge Boothe admitted that some of the statements he made in his letter went beyond scheduling matters and “could be construed” as giving Skipper legal advice. Judge Boothe said that he does not typically give legal advice to people. Judge Boothe admitted that someone reading his letter to Skipper could think Skipper’s letter had influenced him, “[i]f they didn’t know the history” of the case. When Special Counsel asked Judge Boothe whether his letter to Skipper “telegraphs to him this is the way you need to present things to me” to have a motion for reconsideration granted, Judge Boothe admitted: “I see that might be conveyed to him.”
Skipper testified he was surprised and moved when Judge Boothe wrote back to him. Skipper told the Hearing Officer that he did not perceive Judge Boothe’s letter to be legal advice, and did not perceive that the letter contained any instructions on how to file anything. Skipper believed Judge Boothe was conveying to him the idea that if he made constructive changes, “it would pay off ... in some way.” He decided to file a motion to reconsider sentence “as a result of ... the correspondence with the Judge.” When asked what was in the judge’s letter that prompted him to take action, he said: “Well, in reading his letter, I just felt that ... maybe he did have a good review of me, maybe he seen ... this wrong I had during the court proceedings.” Skipper wrote to Judge Boothe again on August 4, 2008, thanking him for responding |33to him, and discussing the possibility of a hearing to consider a reduction in his sentence.
Judge Boothe testified he was “not aware” if the letters were filed into the record of Skipper’s case or furnished to DA Johnson, and testified “I don’t think so” when asked. He testified he probably put them in his “out box” on his desk and did not know what happened to them from that point. As stated earlier, DA Burget presented an affidavit to this Court testifying that Judge Boothe showed him the letters and he shared all the information with DA Johnson.
While a judge has no control over an inmate’s communications with him, and Judge Boothe was certainly not unethical in receiving the letters, Canon 3A(6) required that he inform the DA’s office of the letters. They were clearly intended to influence Judge Boothe to give Skipper another chance by reconsidering his sentence. The Commission did not have any evidence that Judge Boothe gave the letters to ADA Burget. However, we note that DA Burget’s affidavit does not show the letters were given to the DA’s office prior to the hearing, as the hearing was on August 13, 2008, and the affidavit shows Judge Boothe showed the letters to ADA Burget “during late summer or early fall of 2008.” Canon 3A(6) requires that the “contents are promptly made known to all parties.” This Canon would seem to require that the disclosure also be made before any court proceeding involving the *1024 matter, although it does not say so specifically. In light of the above affidavit, it is hard to say that this charge is proven by clear and convincing evidence regarding the letters sent to and received by Judge Boothe.
However, the letter Judge Boothe wrote to Skipper is another matter, as ex parte communications by a judge are prohibited unless made for “scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits.” While Judge Boothe claims his letter concerned scheduling in 134 that it advised Skipper that no judge could reconsider his sentence unless the DA approved, this was in fact a substantive issue on the merits as, evidently, Judge Boothe would not grant the motion unless the DA did not object.
Judge Boothe’s conduct regarding at least the letter to Skipper violated Canons 1, 2A and 3A(6). His actions did not uphold the integrity and independence of the judiciary and did not promote public confidence in the integrity and impartiality of the judiciary. Further, Judge Boothe constituted willful misconduct relating to his official duty in violation of La. Const, art. V, § 25(C), as he clearly knew not to write to an inmate, even if that inmate is acting pro se, on matters dealing with substantive matters relevant to his sentence.

Discipline

In In re Chaisson, 549 So.2d 259 (La.1989), this Court, citing Matter of Deming, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge’s official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
While the Chaisson factors are utilized in considering the appropriate sanction in non-removal cases, in cases where the judge was removed from office, we have also used the guidelines established in In re Whitaker, 463 So.2d 1291, 1303 (La.1985). In re Benge, 09-1617 (La.11/6/09), 24 So.3d 822, 845. In Whitaker, we held:
[t]he most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct.
463 So.2d at 1303. However, “both the La. Const. art. V, § 25 and the Code of Judicial Conduct contemplate, and allow, removal for a broader range of offenses than the illustrative list set forth in Whitaker.” In re Huckaby, 95-0041 (La.5/22/95), 656 So.2d 292, 296-97. The Commission considered the factors in Whitaker and recommended that Judge Boothe be removed from office.[18]
*1025 This Court has consistently held that the “primary purpose of the Code of Judicial Conduct is ‘to protect the public rather than to discipline judges.’ ” Benge, supra at 844 (citing In re Hunter, 02-1975 (La.8/19/02), 823 So.2d 325, 333; In re Shea, 02-0643 (La.4/26/02), 815 So.2d 813, 815; In re Marullo, 06-2222 (La.4/8/97), 692 So.2d 1019). Further, we have emphasized the importance of our duty in this regard:
The power to remove from office a sitting judge, and thereby counter the decision of the voters, is most assuredly an awesome responsibility. But the duty to exercise that authority has been vested in, and entrusted to, this court by the people of this state through our constitution, and it is an obligation to the people of this state that we are required to take seriously.
Benge, supra at 845 (citing Hunter, supra at 333).
As the Commission has recommended removal, we consider the Whitaker factors, and find that while technically Judge Boothe can be said to have used his IsfiOffice in the Skipper hearing improperly for personal gain, we do not find that his conduct warrants removal, which is reserved for the most serious judicial misconduct. Unlike in Benge, where the judge awarded a monetary award to a party based on outside influences and not based upon the evidence or merits of the case, Judge Boothe reduced Skipper’s sentence with the consent and recommendation of the other party, the State, and based upon evidence that Skipper had already served more time than he would have served had he taken the plea bargain. While Judge Boothe went too far in his oral and written reasons in exonerating himself and castigating Judge Johnson, and this type of conduct is inexcusable for a judicial officer, it does appear to be an isolated incident based on an extremely complicated fact pattern.
In addition to Whitaker, the Commission undertook the following analysis of the Chaisson factors:
(a) and (b) The Commission has found Judge Boothe violated the Code of Judicial Conduct and the Louisiana Constitution on the occasions giving rise to the Formal Charge. Further, Judge Boothe was determined to have violated the Code and was privately counseled by the Commission on nine separate occasions over a period of several years.[19]
(c) and (d) Judge Boothe’s misconduct occurred with respect to his official judicial duties. Judge Boothe misused the power and authority of his office for his own personal objectives and the objective of his friend and relative, DA Johnson.
(e) and (f) Judge Boothe has acknowledged the basic facts, but has failed to acknowledge that his conduct was unethical or improper. He asserted he would not change what he did, even if it means he is “disbarred, or kicked out or whatever, defrocked.” His sole expressions of remorse focused on the expense and |S7inconvenience of defending himself before the Commission and not on his conduct and the negative impact his conduct had on the judiciary.
(g) Judge Boothe has served as a judge in the 7th JDC for twenty-one years, so he was a seasoned judge when the charged conduct occurred. Judge Boothe engaged *1026 in the misconduct at issue not because he was unaware of the law and his ethical obligations, but in open and unapologetic disregard for them.
(h) and (i) There has been significant prior misconduct found with regard to Judge Boothe, and both the prior misconduct and the present case have negatively impacted the public perception of the judiciary. The present misconduct was the topic of several newspaper articles.
(j) Judge Boothe flagrantly exploited the power of his office by scheduling and conducting a hearing on an untimely motion for reconsideration of sentence and granting relief when his court had no jurisdiction, all to satisfy his own personal desire for public vindication for himself, to subject Judge Kathy Johnson to public ridicule and embarrassment, and to aid and abet DA Johnson in his desire to exact revenge on Judge Johnson.
While we agree with most of these findings, the evidence was not clear and convincing that Judge Boothe set the hearing on the motion to reconsider sentence without jurisdiction to do so in violation of “clear and determined law about which there is no confusion or question as to its interpretation,” or in order to satisfy his desire for public vindication and to subject Judge Johnson to public ridicule and embarrassment. However, in granting relief via his oral and written reasons, he did vindicate himself and embarrass Judge Johnson, and made public allegations that were unrelated to the merits of the case. Regarding Count IV and the ex parte communications, evidence has been presented that Judge Boothe did make the DA’s office aware of the letters, albeit whether this was timely is uncertain. Nonetheless, | asthere is no excuse for writing to Skipper in prison about a motion to reconsider sentence. Regarding Judge Boothe’s prior misconduct, the Commission describes Judge Boothe’s history of prior misconduct as “long and troubling,” resulting in three letters of caution and six letters of admonishment. We note that the majority of complaints against Judge Boothe were made by Skipper. Finally, Judge Boothe’s failure to acknowledge that his conduct was improper appears to come from a misguided belief that he was obligated to make public Skipper’s allegations against Judge Johnson. Considering all of the evidence and this Court’s findings of serious judicial misconduct, we find that a one year suspension from office, without pay, is the appropriate discipline.

Costs

Louisiana Supreme Court Rule XXIII, § 22 provides the Commission the right to recover costs, subject to this Court’s review. See In re Daniels, 340 So.2d 301, 309 (La.1976); In re Decuir, 95-0056 (La.5/22/95), 654 So.2d 687. The Commission received documentary evidence certifying that the Office of Special Counsel sustained $6,372.37 in costs. The Hearing Officer incurred costs of $3,130.00 and the Commission sustained $2,229.42 in costs. After reviewing these costs, the Commission recommended to the Court that Judge Boothe be ordered to reimburse the Commission in the amount of $11,731.79. We find these costs to be supported by the evidence and properly awardable. Therefore, we order Judge Boothe to reimburse the Commission $11,731.79 in costs.
DECREE
Accordingly, it is ordered, adjudged, and decreed that Judge Leo Boothe, of the Seventh Judicial District Court, be, and is hereby, suspended from office for a period of one year, without pay. Further, pursuant to La. Sup.Ct. Rule XXIII, § 22, we cast | ,¾|Judge Boothe with costs incurred in the investigation and prosecution of this proceeding in the amount of $11,731.79.
*1027 KNOLL, Justice, dissents and assigns reasons.
CLARK, Justice, dissents with written reasons.

. Judge Boothe is presently 70 years of age, and therefore cannot run again when his current term ends on December 31, 2014. See La. Const. art. V, § 23(B).

. On March 24, 2003, Skipper filed a "Motion to Reconsider Sentence under C.Cr.P. art. 881.1 Due to Mitigating Circumstances Concerning Defendant Medical Condition.” On February 24, 2005, he filed a “Motion to Vacate and/or Set Aside Sentence" alleging Judge Boothe had improperly considered illegal factors in sentencing; Judge Boothe denied this motion on May 10, 2005. On July 19, 2005, Skipper filed a "Motion to Correct an Illegal Sentence under Louisiana C.Cr.P. art. 882,” which Judge Boothe denied on July 29, 2005 as being untimely. On August 12, 2005, Skipper filed an "Application for Writ of Habeas Corpus,” which Judge Boothe denied as untimely on August 29, 2005. Also on August 12, 2005, Skipper filed a "Motion to Reconsider Court Ruling Denying Defendant's Motion to Correct and [sic] Illegal Sentence Where the Court Ruled Motion was, 'Untimely Filed,’ Which is a Clear Error of Law as Stated in Criminal Code of Procedure Article 882(A) and Supported by Case Law;” this motion was denied as untimely on August 29, 2005. On November 30, 2005, Skipper filed a "Motion to Reopen Motion to Reconsider Sentence filed' on Feb. 24, 2005 to Enforce Broken Sentencing Agreement made between State, Trial Court, and Defense Attorney Representative of Defendant.” This motion alleged Skipper had been told he would be released from prison on an appeal bond and allowed to remain free on probation if he helped Sheriff Randy Maxwell garner enough African-American votes to win the run-off election in 2003 and other similar claims. On January 11, 2006, Skipper filed a motion seeking to recuse Judge Boothe. This motion was heard by Judge John Joyce and was denied in February 2006. On August 28, 2006, Judge Boothe signed Reasons for Judgment that addressed all of the various motions filed by Skipper and noted that "Defendant had until May 7, 2006 in which to file any and all of his applications for post-conviction relief.” Judge Boothe denied all motions as either being untimely, moot, or without basis in fact or law. On June 20, August 8, and November 27, 2007, Skipper filed various motions for reconsideration of sentence, which were all denied by Judge Boothe on December 3, 2007.

. Judge Boothe filed a recent motion to supplement the record with an affidavit from Bradley R. Burget, the current DA of the 7th JDC, stating that the DA’s office received the letter. Specifically, he stated he was an ADA in the 7th JDC from August 2, 2002, until June 6, 2008, and the DA from October 4, 2008, until the present. Burget states:
"[d]uring the late summer or early fall of 2008, Judge Boothe showed me a series of correspondence between he and Inmate James Skipper (see attached letters). This information was of interest because I too received a letter from Inmate James Skipper. I immediately shared all the above information with then District Attorney John F. Johnson.
He also states he was never interviewed by any investigative agency about this and did not know about the importance of this disclosure because of the confidentiality involved in judicial discipline proceedings. Judge Boothe's motion claims that Brad Burget only became aware of the importance of these letters when he attended oral argument before this Court on September 7, 2008. Considering Brad Burget is an officer of the court, we will grant Judge Boothe’s motion to supplement the record with this affidavit.

. Judge Johnson took office in Division "A” of the 7th JDC (a two-judge district) in March 1996. There is a perception in the local community that Judge Boothe and Judge Johnson do not get along with each other. While Judge Boothe denied any ill feelings toward Judge Johnson, he did make frequent reference to information he had received to the effect that if Judge Johnson had an opponent in the 2008 judicial election she was going to qualify to run against Judge Boothe in Division "B."

. Ronnie McMillin, the ADA who had prosecuted Mr. Skipper's case, saw Mr. Skipper go into DA Johnson's office on the day of the Reconsideration Hearing. He testified that the meeting lasted about one hour, and that after the meeting, Mr. Skipper told him that DA Johnson had asked him "to do some things politically” and that he was going to get out of jail that day. For his part, Mr. Skipper could not recall having this conversation with Mr. McMillin.

.Skipper’s telephone calls were monitored by a former investigator for the Louisiana State Police, Richard Ortego, who was then working at the Avoyelles Correctional Center. Mr. Ortego brought the conversations to the attention of the Louisiana Attorney General’s Office, which in turn disclosed them to District Attorney John Johnson sometime in 2006 or 2007. Coincidentally, Mr. Ortego and Judge Johnson were involved in a romantic relationship at one time.

. Before the Hearing Officer, Skipper testified that he had several other conversations with Judge Johnson, including ones in which Judge Johnson told him which documents to subpoena and include in his motion to recuse Judge Boothe. These documents involved instances in which Judge Boothe's ability to serve as a judge was called into question. Because the Hearing Officer made no comments about these allegations, we cannot express an opinion about the truthfulness of these allegations.

. Before the Judiciary Commission, Skipper testified that Mr. Conner wanted him to go to trial "because it would expose some old things that were going on throughout the— concerning discrimination against blacks throughout the system.” Mr. Conner told him he thought the whole trial was in response to a recall petition Skipper had filed against the mayor.

. All references to these allegations and documents introduced in support of or opposition to this count were redacted from the record. See In re Sassone, 07-651 (La.6/29/07), 959 So.2d 859, 876. Also redacted from the record were materials pertaining to other complaints against Judge Boothe that were closed without action, other unresolved complaints against Judge Boothe, and complaints against judges other than Judge Boothe. See La. S.Ct.R. 23, § 23. Judge Boothe has filed a motion to supplement the record with these redactions. The Court deferred this motion to the merits and at this time denies the motion.

. Although he was subpoenaed to appear at the hearing before the Hearing Officer, Mr. Conner did not show up for that hearing. However, the transcript of his deposition testimony was introduced into evidence by Judge Boothe.

. After the September docket was posted, Judge Boothe filed a motion in which he urged the court to remand this case to the Commission so that he could submit additional evidence. Specifically, Judge Boothe sought the opportunity to cross-examine the three witnesses who appeared before the Commission at its May 18, 2012 meeting (Mr. Conner, Mr. Skipper, and Judge Johnson). He also sought to introduce testimony from three witnesses (Phillip Letard, Derrick Carson, and Jack McLemore) regarding allegations which were raised during the May hearing. On August 24, 2012, this Court ordered that Judge Boothe’s motions would be referred to the merits. These motions are now denied. See Supreme Court Rule XXIII, § 29(f). On September 5, 2012, Judge Boothe filed objections to the redactions in the record and a motion to compel. On October 11, 2012, he filed a motion to file a supplemental brief in this motion, arguing that Counsel to the Commission, Mary Whitney, served as Special Counsel during and for Judge Boothe's case before the Commission. Ms. Whitney was named to the position of Counsel to the Commission on July 30, 2012. On August 7, 2012, Ms. Whitney certified the record of this case with this Court with the redactions about which Judge Boothe complains. Judge Boothe claims that during oral argument before this Court, the Assistant Special Counsel told the Court that the Office of Special Counsel "did not participate” in these redactions. Judge Boothe claims in the motion that Ms. Whitney's involvement in this case as Special Counsel is a potential violation of Rule XI, B(2)(a) and (b) of the Commission. He claims the redactions are prejudicial to him and Ms. Whitney’s participation in the redactions, coupled with the misrepresentation to the Court regarding her involvement, is a serious irregularity in these proceedings and potentially a violation of his right to due process. In response, the Office of Special Counsel points out that Ms. Whitney did not actually become Counsel to the Commission until August 10, 2012 and has recused herself from this matter throughout this entire case and has not participated in any proceedings before this Court. In light of this clarification, we deny Judge Boothe’s objections to the redactions and the motion to compel. As stated earlier, Judge Boothe’s motion to supplement the record with DA Burget’s affidavit is granted.

. La.C.Cr.P. art. 916 provides:
The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and to:
[[Image here]]
ls) Correct an illegal sentence or take other appropriate action pursuant to a properly made or filed motion to reconsider sentence.
[[Image here]]

. La.C.Cr.P. art. 881.6, added by Acts 2011, No. 349, § 1, provides in part:
A. Upon motion of the state, the sentencing court may reduce the defendant’s sentence if, after sentencing, the defendant provided substantial assistance in furtherance of the investigation or prosecution of another person.

. Judge Boothe testified that he set the hearing for a "myriad of reasons." The first was that Skipper had a young son growing up without a father who Judge Boothe saw at church and was "a real cute little guy.” Further, Judge Boothe testified he took into account that by 2008, Skipper had served more time than he would have served if he had accepted the plea deal offered to him in 2002. While the Commission took issue with the fact that no evidence was introduced at the hearing involving hardship, the ground on which this and all prior motions for reconsideration were based, we note that Skipper attempted to offer hardship evidence towards the end of the hearing but Judge Boothe told him this was not necessary as he was already aware of all the hardship information.

. Judge Boothe admitted that after Skipper testified he was involved in a conspiracy with Judge Johnson to make Judge Boothe look bad, it crossed his mind that he should recuse himself. Referring to "a matter in which another judge ... in a two-judge district” was involved, Special Counsel asked Judge Boothe: "Do you believe that ... under these circumstances that it would reasonably appear that your impartiality might be in question?” Judge Boothe admitted: "Well, that could be a factor.” The following line of questioning demonstrated Judge Boothe’s rationale on his recusal:
Q ... based on relationship with Judge Johnson and evidence coming out at the hearing that there was a conspiracy against you, didn’t that present facts to you that your impartiality might reasonably be questioned?
A. Well it might be construed, but let me tell you something. I had no concern with my political — it never entered my mind. I never thought about my political. I think they said I had political — personal goals. Never entered my mind ... and I just thought Judge Johnson was peripherally involved.
[[Image here]]
It didn’t make any difference if it was Judge J, Judge K, Judge L. It was a situation where Skipper had been used through Con *1022 ner, and that was my appreciation of it ... And I did briefly consider recusing myself, [because of] some of the stuff you mentioned, but then I decided that it doesn’t meet the test, that she’s not — she’s not party to this.
Q. And what's the test?
A. That — that you have enough of an appearance of impropriety that the public would frown on it or something like that. And I thought it was — a lot of times you have to weigh things. And I thought the justice — the justice in the particular situation had considerably more weight than just a recusal situation, which, like I said, I generally don't recuse myself unless I feel like that I can't handle the case fairly. And I just didn't think that the appearance was that bad of this situation. She was not a party to the proceedings.

. He explained:
... Once those tapes were there, they were part of the public record. And I just — I just felt that knowing Derrick Carson had told me about how Justin denied the plea. And I knew of Judge Johnson's close, close relationship with Justin Conner. I've known that for a long time. I just felt like I could be fair to [James Skipper] and he needed fairness, that that’s what he deserved if he was up here before me. And if I recused myself with a judge, quite frankly, that doesn’t have — doesn’t know what Mr. Derrick Carson told me, doesn’t know the flavor of Justin Conner’s relationship with Judge Johnson, he might not have got justice. He might still be rotting in jail. And I — I like to deliver justice.

. When he was asked by a Commission member why he took a month to draft lengthy written reasons for his decision, especially where both of the parties were in agreement with the outcome, Judge Boothe explained that he felt he “needed to express myself in more precise terms.” He also stated that the case was "a little unusual,” and that he "felt like it needed fleshing out to explain how I reached my decision ... to give Mr. Skipper relief.” Judge Boothe told the Commission that he went into great detail in his oral and written reasons concerning the actions of Judge Johnson, Mr. Conner, and Skipper in order to "flesh out” what he saw as a constitutional violation.

. The Commission recommended to the Court that Judge Boothe be removed from the bench believing the evidence presented egregious misconduct involving Judge Boothe’s abuse of the power of his office to satisfy his own personal desires and those of his friend, *1025 and Judge Boothe's total lack of insight into or remorse for his misconduct.

. Describing Judge Boothe's prior disciplinary history as “long and troubling,” the Commission noted that he has been issued three letters of caution and six letters of admonishment.